UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-14329-CIV-MAYNARD

PATRICK S. BRAGDON, JR.,

    Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner,
Social Security Administration,

    Defendant.

_____/

FILED by _____ D.C.

OCT 2 2 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 27)

**THIS CAUSE** comes before this Court upon the above Motion. Having reviewed the Motion, Response, Reply, and Administrative Record (DE 17), and having held a hearing thereon on October 18, 2018, this Court finds as follows:

### BACKGROUND

1. The Plaintiff applied for Title II disability insurance benefits under the Social Security Act in November 2013. The application was denied initially and after reconsideration. On January 20, 2017 an Administrative Law Judge ("ALJ") rendered a decision finding the Plaintiff not disabled under the terms of the Act. The Appeals Council denied his Request for Review on February 28, 2017, thereby leaving the ALJ's decision final and subject to judicial review.

2.     The medical record begins on November 16, 2005 when a steel beam dropped on his left foot. It was a workplace injury. An x-ray showed fractures in his big and third toes. The contemporaneous treatment records do not confirm the Plaintiff's later description that the injury had crushed his entire foot. The injury was treated with a splint and opioid pain medication.

3.     On May 16, 2006 the Plaintiff was involved in a motor vehicle accident. The Plaintiff was driving through an intersection when another car ran a red light and hit his car. The Plaintiff did not go to the emergency room. Instead the Plaintiff went to Dr. Hermida two days later for care. He complained primarily of right shoulder pain but also of neck and low back pain. X-rays were overall unremarkable. The only orthopedic abnormality found was of some mild widening of the shoulder joint with a type 2 acromion. An MRI of his right shoulder showed tendonosis or tendonopathy of the rotator cuff tendon complex. There were no tissue tears, just mild degeneration. The Plaintiff was prescribed pain medications, and his right arm was placed in a sling. Dr. Hermida placed the Plaintiff on no-work status. The pain in his right upper extremity and the resulting functional impairments prevented him from performing his construction job, the doctor explained.

4. Physical therapy failed to improve the shoulder's functioning (and the Plaintiff was not doing home exercises). The Plaintiff feared that physical therapy was worsening his shoulder condition. Nor did a joint injection help. Given the lack of progress Dr. Hermida recommended in August 2006 a diagnostic arthroscopy. Dr. Aparicio, a colleague of Dr. Hermida's, concurred with that recommendation. Dr. Aparicio agreed that given the presence of some objective impingement signs; the lack of improvement after conservative treatment measures; and the Plaintiff's inability to return to his exertionally demanding construction job, diagnostic and reparative surgery was warranted.

5. The motor vehicle accident was subject of litigation. In September 2006 Dr. Hermida wrote a letter to an attorney describing the right shoulder injury that that accident had caused. At a minimum, Dr. Hermida wrote, the Plaintiff has an impingement syndrome as well as a possible rotator cuff, labral and proximal biceps tendon injury for which surgery is recommended.

6. There is no record of that surgery taking place. At the follow-up appointment with Dr. Hermida in January 2007 the Plaintiff explained that his blood pressure is too high to permit surgery. Moreover he had been out of the country for some

time. The Plaintiff reported that his right shoulder pain had continued although it was now less severe. The physical examination likewise showed his shoulder to be much improved. Nevertheless Dr. Hermida still saw need for arthroscopy surgery.

7. Nor had the Plaintiff undergone the arthroscopy surgery by time of the next appointment with Dr. Hermida in June 2007. At that appointment the Plaintiff complained of continued right shoulder pain, weakness, and decreased range of motion. Dr. Hermida did not prescribe a renewed round of physical therapy for his shoulder because the Plaintiff said he could not tolerate it. Instead Dr. Hermida prescribed physical therapy for his cervical and trapezius region given his complaint of lingering neck pain and transient right arm numbness. Given the lack of progress, Dr. Hermida also declared Maximum Medical Improvement. The doctor rated the Plaintiff at a 15% whole body impairment for his right shoulder and 3% for the myofasciitis in his cervical spine. A treatment note from the Family Medicine and Healthcare clinic from June 2007 suggests an ongoing pain medication prescription.

8. Two months later, on August 16, 2007, the Plaintiff was involved in a second car accident. He hit another car that had pulled out in front of him to make a left-hand turn. He did

not go to the hospital. Instead, on August 29th, he returned to Dr. Hermida. He reported injury to his neck and left foot.

9. On September 28, 2007 the Plaintiff saw Dr. Jacobs for a Comprehensive Orthopedic Evaluation. That evaluation concerned the prior car accident from May 2006, however, and Dr. Jacobs mailed his report to an attorney. Dr. Jacobs reviewed the Plaintiff's treatment history to-date, reviewed radiographs, and conducted his own physical examination. Dr. Jacobs agreed that the Plaintiff had suffered a soft tissue injury to his right shoulder, but it was mild. Dr. Jacobs attributed it to his work history rather than an acute injury. Dr. Jacobs saw no objective medical evidence of a cervical abnormality, and Dr. Jacobs saw no objective evidence that corroborated the pain that the Plaintiff was describing. Instead Dr. Jacobs suspected pain exaggeration. The Administrative Record also contains one page from a second report that Dr. Jacobs authored in October 2007. That page shows that Dr. Jacobs persisted in his opinion of pain exaggeration and objective evidence of only a mild shoulder defect even after taking into consideration the more recent car accident. The Plaintiff was 42 years old at the time.

10. With the exception of 2001 the Plaintiff reported taxable income every year since 1980. 2007 was the second exception when the Plaintiff reported no taxable income.

Earnings records show that the Plaintiff returned to work in 2008 and worked through 2013. Records suggest that the Plaintiff may have made a return trip to Costa Rica at some point during this period of time.

11. There also is a contemporaneous gap in medical treatment. Except for Dr. Jacobs who examined the Plaintiff on a consultative basis, the Plaintiff sought no medical care after his August 2007 appointment with Dr. Hermida. He did not seek medical care again until April 2009 when the Plaintiff went to the Accident and Wellness Center complaining of pain in his neck, shoulder, and foot.

12. In June 2009 the Plaintiff began seeing a chiropractor, Dr. Aquino, DC. At that appointment the Plaintiff reported the widest range of pain complaints in the treatment record. He reported pain in his neck and upper back that radiates into his right shoulder, and he reported low back pain. Conservative treatment measures were begun, and the Plaintiff saw Dr. Aquino DC for frequent adjustments and treatment sessions through that November.

13. MRI's were taken on July 31, 2009. The MRI of the Plaintiff's cervical spine showed a herniation at the C5—6 disc with straightening suggestive of muscle spasms. The MRI of the Plaintiff's right shoulder showed tendinopathy with small joint

effusion, and the MRI of his left foot showed some joint swelling.

14. On August 24, 2009 the Plaintiff saw Dr. Krost for a comprehensive physiatric evaluation and EMG/NC study, referred by Dr. Gomez whom the Plaintiff had seen on August 6th. The Plaintiff attributed to the August 2007 car accident the acute onset of neck pain with the exacerbation of right shoulder and left foot pain. The Plaintiff's primary pain complaint was of radiculopathy down his right arm. The Plaintiff reported no improvement from conservative treatment measures, and the Plaintiff said the pain prevents him from working as a carpenter and foreman. (It did not prevent all work, however, because the Plaintiff has taxed earnings from 2008 through 2013). The Plaintiff also attributed to the pain a decline in life quality. The record does not contain the actual EMG/NC study results. Dr. Krost reported the premature termination because of the Plaintiff's non-tolerance, but Dr. Gomez later said the test showed chronic radiculopathy in the Plaintiff's right arm originating from the C6 disc site. Dr. Krost diagnosed chronic cervicalgia and reactive myofascial spasm. Dr. Krost found the Plaintiff's pain complaints to be consistent with cervical radiculitis and distal nerve entrapment. Lastly Dr. Krost

diagnosed tendonitis in the Plaintiff's right shoulder but
doubted any rotator cuff pathology.

15.   At a follow-up appointment on September 22, 2009 Dr.
Gomez recommended a discectomy and fusion surgery at the C5—6
disc site based on the prior MRI showing a herniation and the
Plaintiff's complaints of neck pain with pain radiation and
radiculopathy. Curiously an MRI taken on the same day as that
appointment was unremarkable, showing no herniation or other
disc defect in the Plaintiff's cervical spine. Dr. Gomez did not
factor that unremarkable MRI into his opinion.

16.   On October 7, 2009 the Plaintiff saw Dr. Dare for a
second opinion. Dr. Dare diagnosed mechanical neck pain and
cervical radiculopathy, tendinopathy in the right shoulder, and
left foot pain. Citing the prior MRI showing a large herniation,
Dr. Dare also recommended fusion surgery of the C5—6 disc. The
Plaintiff still was considering whether to go through with it at
the follow up appointment on November 2, 2009. The record does
not show that that surgery ever took place.

17.   Through the second half of 2009 the Plaintiff had been
seeing Dr. Aquino DC for chiropractic adjustments. Those ended
in late November 2009. Those treatment notes show no improvement
and indeed no significant change in the Plaintiff's pain
complaints despite the frequent therapy. The Plaintiff continued

to complain of neck pain that radiates down into his right shoulder.

18.  On December 16, 2009 the Plaintiff saw another chiropractor, Dr. Simon DC, but this time for an Independent Medical Examination. At issue was the Plaintiff's complaints of pain (in his right shoulder, neck, and left foot) that he was attributing to the August 2007 car accident. When Dr. Simon DC observed the Plaintiff directly for the physical examination, the Plaintiff reported severe pain complaints. By comparison, the Plaintiff exhibited no such pain manifestations when he was not under direct observation. Dr. Simon DC regarded the Plaintiff's subjective pain complaints as disproportionate to what the objective medical evidence suggests. Dr. Simon DC opined that there was no restriction of the Plaintiff's daily life activities, and he saw no causal relationship with the August 2007 car accident. Lastly Dr. Simon DC opined that chiropractic care should be stopped since the Plaintiff was receiving no therapeutic benefit from it.

19.  That next day, on December 17, 2009, the Plaintiff had another IME, this time with an orthopedic surgeon, Dr. Sciarretta[1]. Unlike Dr. Simon DC, Dr. Sciarretta reported no pain exaggeration, and instead reported observing a variety of pain

---

[1] This is the only medical opinion statement of record that was not addressed in the second, unfavorable Decision.

manifestations during the physical examination. Nor did Dr. Sciarretta report the unhygienic and disheveled state that Dr. Simon DC had observed of the Plaintiff. Citing the MRI from July 31, 2009, Dr. Sciarretta diagnosed a cervical disc herniation, and citing the EMG/NC study, he diagnosed radiculitis originating from the C6—7 disc. He also diagnosed a pre-existing right shoulder impingement condition which the August 2007 accident had aggravated, and he diagnosed a sprain of the Plaintiff's left forefoot.

20.    The Plaintiff sought no more medical care related to those car accidents. Thus there is a treatment gap between the discontinuation of chiropractic care in November 2009 and the Plaintiff's next injury event in June 2013. (The one exception occurred in July 2010 when the Plaintiff went to the hospital for gout-related right knee pain. Acute gouty arthritis and hypertension were diagnosed. The Plaintiff declined the attendant's Toradol prescription.) In June 2013 the Plaintiff told Dr. Hermida that all of his pain complaints up through this period of time---that is, his neck and shoulder pain from the car accidents---had fully resolved by this point.

21.    The Plaintiff was working during this period of time. He also got his GED in August 2012. His hope was that the GED

would help him find less exertionally demanding work as his physical abilities declined, he explained.

22.    The Plaintiff was working as a construction foreman when he had a workplace accident involving a heavy jackhammer. He was working at a hospital construction site at the time, and therefore went to that hospital for treatment. He complained of low back pain and tingling in his left foot. X-rays of his cervical and lumbar spines as well as of his right shoulder all were unremarkable. Acute lumbosacral strain and left-leg sciatica were diagnosed.

23.    On June 24, 2013 the Plaintiff returned to Dr. Hermida, this time for an orthopedic consultation regarding the workplace injury. The Plaintiff's primary complaint was of low back pain with pain radiating down his left leg. (Secondarily the Plaintiff reported re-aggravation of his since resolved neck and right shoulder pain.) An MRI of his lumbar spine was normal. Thus Dr. Hermida concluded that the primary underlying problem was musculo-ligamentous in nature---as opposed to an orthopedic defect---and he diagnosed acute cervical and lumbar sprain/strain. Dr. Hermida therefore regarded physical therapy as the best form of treatment to pursue. This Court notes that both Dr. Hermida and the hospital also were prescribing opioid pain medication.

24.   The Plaintiff did not return to work after the June 6, 2013 workplace injury, and he claims that date as his date last worked. June 6, 2013 also is his alleged disability onset date.

25.   That workplace injury was subject of a Worker's Compensation claim. Initially Dr. Hermida had put the Plaintiff on temporary no-work status, but at the August 2013 appointment Dr. Hermida released the Plaintiff to light duty work. The doctor limited the Plaintiff to lifting no more than 20 lbs. in weight; no lifting from ground level; and no bending or squatting.

26.   Also in August 2013 the Plaintiff left Fort Lauderdale. He no longer could afford to live there, and he moved to Port St. Lucie to live with a friend. Shortly thereafter his wife and children moved to Costa Rica because he no longer could support them. After the move, the Plaintiff did not return to Dr. Hermida and instead sought treatment from providers closer to his new residence.

27.   The Plaintiff began seeing Dr. Girard for both physical therapy and orthopedic medical care. Dr. Girard agreed with Dr. Hermida's assessment that the underlying condition was soft tissue in nature. It was noted how the lumbar MRI showed no orthopedic defect. Therefore the type of treatment remained physical therapy (in addition to the pain medication

prescriptions of Tramadol, Flexeril, and Vicodin). The focus of physical therapy, in turn, was on the Plaintiff's lumbar area since his neck pain had eased substantially. Hindering progress was the Plaintiff's fear that physical therapy would worsen his condition. His therapist strongly encouraged him to push forward both at the therapy sessions and in his home exercise regimen in order to make progress.

28.    In mid October the Plaintiff began to complain of some popping and clicking in his low lumbar spine area. The physical therapist observed no such problem but focused treatment on the L5 facet and sacroiliac joint. By October 28th the Plaintiff blamed severe low back pain for preventing his continued participation in physical therapy. Given the Plaintiff's lack of progress or improvement with physical therapy, Dr. Girard referred him to pain management for sacroiliac joint injections. For the same reason Dr. Girard discontinued physical therapy. Nevertheless, despite those reported problems, on November 25th the Plaintiff reported significant improvement, and the sacroiliac joint malalignment issue was deemed resolved. It was for that reason and the determination that he had reached maximum improvement that physical therapy was concluded. The Plaintiff also reduced his pain medication regimen to just

Ultram. His diagnosis continued to be of lumbar and cervical muscle strain.

29.   During the course of treatment Dr. Girard had been filling out work release forms for the Worker's Compensation provider. Dr. Girard continued Dr. Hermida's restriction to light duty work with weight-bearing not to exceed 20 lbs.[2] and for the Plaintiff to avoid lifting weight from floor to waist levels.

30.   On November 6, 2013 the Plaintiff applied for disability benefits. The Plaintiff claimed disability due to severe pain. He claimed a ligament tear in his right shoulder and a crushed left foot (neither of which the objective medical evidence confirms). He claimed a herniated cervical disc (for which the MRI's of record are in disagreement) and low back pain. He claimed severe pain in his various joints (hip, feet, shoulders, and hands) as well as swelling in his feet and ankles. Lastly he claimed hypertension, headaches, and blurred vision.

31.   The Commissioner sent the Plaintiff to the Fort Pierce Family Care practice for a consultative physical examination. That examination took place on December 7, 2013 although the

---

[2] The second ALJ found in the unfavorable Decision that in several work release forms Dr. Girard had limited the Plaintiff to handling 20 lbs. or less except in the work release form dated November 25, 2013 when Dr. Girard apparently increased the Plaintiff's weight-bearing ability to 30 lbs.

doctor's name is unknown. The examining doctor noted tenderness in the Plaintiff's cervical and lumbar spines, pain in his right shoulder with motion, and tenderness in his left foot. The Plaintiff was unable to ambulate in normal heel to toe fashion although he was steady without assistance and had fair balance. The examining doctor opined that the Plaintiff "appears capable of sedentary activity with brief periods of light physical activity with no lifting or more than 15 pounds."

32.    The Plaintiff did not continue seeing Dr. Girard, and he found no new primary care physician. Medical care instead consisted of trips to the hospital emergency room for refills of his blood pressure medication. In August 2014 he reported a trip to Costa Rica. The hospital notes from those repeat visits show no hypertension-related complications. That implies that the condition remained well-controlled. These hospital treatment notes show no problems relevant to the Plaintiff's disability claim either.

33.    In April 2014 the Plaintiff saw Dr. Billinghurst for a Worker's Compensation evaluation. The Plaintiff complained of severe ongoing low back pain unrelieved by his pain medications (Tramadol, Flexeril, and ibuprofen). An MRI was taken of his lumbar spine, and it showed bulging at the L4—5 and L5—S1 discs. Dr. Billinghurst diagnosed lumbago. The doctor recommended

conservative treatment measures. As for the Plaintiff's work ability, Dr. Billinghurst opined that the Plaintiff can do sedentary work (with minimal standing or walking); no repetitive postural movements (such as bending, squatting, kneeling, stooping, twisting, or turning); no weight-bearing at all; no climbing stairs or ladders; and the need to take frequent rest breaks.

34. In December 2014 the Plaintiff saw Dr. Blum complaining of a cervical herniation, left foot swelling, and weight-gain from inactivity. Dr. Blum described the Plaintiff as anxious and stressed, but otherwise the physical examination was normal. At a follow-up appointment in April 2015 Dr. Blum observed limited neck range.

35. The Plaintiff testified at the hearing which took place on July 9, 2015. So did a Vocational Expert (Pamela Tucker). Afterwards, on November 10, 2015, the ALJ (Joseph Heimann) rendered a favorable Decision that granted the Plaintiff's disability application. (That favorable Decision begins at page 130 of the Administrative Record.) ALJ Heimann found the Plaintiff to have the severe impairments of a herniated disc in his cervical spine; disc bulge, sprain/strain, radiculopathy, and sciatica in his lumbar spine; right shoulder tendinopathy; left foot joint effusions; and obesity. ALJ

Heimann assessed an RFC for a reduced range of sedentary work. One of the added restrictions was the need to take a ten-minute break every hour (for a total of 30 to 60 minutes when the Plaintiff would be off workday tasks). ALJ Heimann found the Plaintiff's disability to start on April 1, 2014, the amended disability onset date that the Plaintiff was claiming at that time.

36.    Then on January 8, 2016 the Appeals Council remanded that favorable Decision to a new ALJ for re-consideration. (The Appeals Council's remand order begins at page 214.) The Appeals Council found the Decision not to be supported by substantial evidence, particularly the rest break limitation. While the Appeals Council conceded that the Plaintiff's injury events "cause[d] some degree of injury," it saw no medical evidence in the record since April 1, 2014 to support the degree of limitation that the ALJ had assessed. The Appeals Council furthered that the ALJ had given too much weight to Dr. Billinghurst's RFC opinion and did not reconcile the inconsistencies between the consultative examiner's report and the RFC that the ALJ ultimately assessed. The ALJ had given too much weight to the Plaintiff's subjective credibility, the Appeals Council furthered, by overly relying on the Plaintiff's work history and not taking into consideration various factors

contrary to his allegations. The Appeals Council therefore found the ALJ's subjective credibility analysis inadequate under the standards of SSR 96—7p[3] and 20 C.F.R. § 404.1529. Upon remand the Appeals Council advised the new ALJ to take new evidence; re-evaluate the Plaintiff's subjective credibility; re-assess the Plaintiff's RFC and state a "rationale with specific references to the evidence of record in support of the assessed limitations, including further evaluation of the medical and other opinions of record"; and obtain supplemental vocational expert testimony. However the new ALJ did not solicit the testimony of a medical expert which the Appeals Council also had given him leave to do.

37.    The Plaintiff went to the hospital in April 2016 seeking refills of his hypertension medications (atenolol and lisinopril). The Plaintiff also complained of chronic pain in his right hip, with numbness radiating from it and down his right leg. He blamed his chiropractor for dislocating his right hip at a treatment session in December 2014. This Court notes at this juncture that nothing in the medical record correlates with this complained-of injury or pain event. The closest mention of something equivalent is found in the physical therapy notes from

---

[3] This Court notes that SSR 16—3p replaced SSR 96—7p three months later on March 28, 2016. It does not appear that the new ALJ applied SSR 16—3p for purposes of the unfavorable Decision rendered on January 25, 2017.

October 2013. At that time the Plaintiff complained of some popping and clicking in the right low lumbar spine area. However that pain complaint was not attributed to a physical therapy or chiropractic treatment injury event nor did it concern the Plaintiff's hip. Moreover that pain complaint fully resolved by December 2013.

38. In May 2016 the Plaintiff returned to Dr. Blum. He came seeking refills of his hypertension medications as well as for his pain medications (Tramadol and Flexeril). He complained of back pain as well as of right hip pain aggravated by physical therapy. He also complained about loss of mobility and endurance and resulting inactivity from the cumulative injury events over the years.

39. On June 28, 2016 the Plaintiff saw Dr. Henderson for a consultative physical examination (the second one of record). Dr. Henderson observed the Plaintiff to be overweight and to walk with a limp. He observed some reduced motion range, and he observed mild difficulty with heel to toe walking, squatting, and arising from a seated position. He observed the Plaintiff to have no difficulty getting on or off the examination table. Dr. Henderson also filled out an RFC questionnaire (which begins at page 1017 of the Administrative Record). He opined that the Plaintiff can lift 50 lbs. or more occasionally (or 11 lbs. or

more frequently) and can carry 21 lbs. or more occasionally (or 11 lbs. or more frequently). He opined that the Plaintiff can sit for six hours at one time or for seven hours total in a workday; stand for two hours at a time or for three hours total in a workday; and can walk one hour at a time or for two hours total in a workday. He saw no need for an ambulatory aid. The only upper extremity impairment that Dr. Henderson noted was overhead reaching with the right hand which the doctor limited to an occasional basis (with the Plaintiff able to do all other upper extremity functions on a frequent basis). Similarly Dr. Henderson limited left foot operation to an occasional basis, and he limited climbing stairs, ramps, ladders, and scaffolds to an occasional basis.

40.  On July 28, 2016 the Plaintiff went to the Urgent Care Chiropractic Pain Center seeking pain relief. The physical examination was positive for paraspinal spasm, hypomobility, and tenderness. Low back pain was the Plaintiff's primary pain complaint. The Plaintiff also filled out questionnaires in which he described severe pain that causes a substantial degree of impairment.

41.  On August 1, 2016 Dr. Blum filled out an RFC questionnaire. Similar to Dr. Henderson, Dr. Blum opined that the Plaintiff's weight-bearing ability is equivalent to the

medium exertion level. On one hand Dr. Blum reported no standing or walking difficulty, but on the other hand he limited the Plaintiff's ability to stand or walk to two hours. Arm use is limited to three hours total in a day. Lastly Dr. Blum opined that the Plaintiff can sit no longer than three hours total in a day and will need to be able to stand up to change position at will.

42. A second ALJ (Thurman Anderson) held a hearing on October 27, 2016. The Plaintiff was 51 years old at the time. The Plaintiff claimed severe pain in his low back, neck, right shoulder, left foot, and right hip. He said he can stand only for fifteen minutes before he begins to experience numbness in his left leg. Lifting is limited to the weight of a gallon jug. He walks with a cane because his hip is prone to giving out. Driving is limited to short distances. His hypertension medication causes dizziness, and he experiences numbness over his whole body. Also testifying at the hearing was a new Vocational Expert (Jeffery Lucas).

43. ALJ Anderson rendered an unfavorable Decision on January 25, 2017 that denied the Plaintiff's disability application. First ALJ Anderson found fewer severe impairments at Step Two of the disability analysis: he did not include the neck and left foot pain conditions that ALJ Heimann did. Nor did

he account for the Plaintiff's hip pain and hypertension-based complaints. ALJ Anderson found the Plaintiff capable of performing medium exertion work. Although that was the RFC that the ALJ assessed, in practical effect an RFC for a reduced range of light work applied[4]. The ALJ noted the VE's explanation about how the Plaintiff's RFC "with the exertional, postural, manipulative and environmental restrictions" limit the Plaintiff "to a reduced range of light work." Construing the Plaintiff's RFC in that fashion, the VE opined---and the ALJ accepted---that the Plaintiff is unable to return to his past relevant work as a construction superintendent[5]. Next the ALJ considered the availability of other, more amenable kinds of jobs. Based on the VE's testimony, the ALJ found the Plaintiff able to perform such other light exertion jobs as marker, night guard, and companion. The ALJ therefore concluded that the Plaintiff is not disabled.

### DISCUSSION

44. Judicial review of the Commissioner's decision is limited to a determination of whether it is supported by

---

[4] Had the ALJ assessed an RFC for sedentary work, then Rule 201.14 of the Medical-Vocational Guidelines ("Grids") would direct a finding of disabled as of February 2015 when he turned 50 years old, the Plaintiff argues in his Motion.

[5] The underlying record suggests that the Plaintiff did not hold the position of a "superintendent" in the sense of a purely administrative or managerial position. At the time of his jackhammer workplace injury in June 2013 the Plaintiff identified his job title as a "foreman". In earlier treatment notes the Plaintiff describes exertionally demanding job duties. Indeed the ALJ noted how the Plaintiff describes his job as requiring heavy exertion.

substantial evidence and whether the proper legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). Supporting evidence need not be preponderant to be substantial so long as it amounts to more than a scintilla; in other words, it is such relevant evidence that a reasonable person might accept as sufficient and adequate to support the conclusion reached. See id. at 1440. If the decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court re-weigh the evidence nor substitute its judgment for that of the ALJ. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). While the Commissioner's factual findings enjoy such deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007). See generally, Jordan v. Comm'r, 470 Fed.Appx. 766, 767-68 (11th Cir. 2012).

45. The Plaintiff's first objection to the unfavorable Decision concerns the ALJ's handling of the RFC questionnaire that Dr. Blum filled out on August 1, 2016 (and found in the record at page 1089). The ALJ noted Dr. Blum's opinion that the Plaintiff "could perform medium work with exertional and postural limitations". The ALJ gave "this assessment partial

weight because of the recency of the examination in the record and the treatment relationship between Dr. Blum and the [Plaintiff]." This Court construes the ALJ's statement to be reasons for giving Dr. Blum's questionnaire some degree of weight. The problem is that the ALJ does not say why he gives it only partial---that is, less than full---weight. In other words the ALJ does not say why he discounted it, the Defendant concedes. That is not to imply that the ALJ should have given Dr. Blum's questionnaire full weight.

46. In addition to the ALJ's incomplete reasoning about the evidentiary weight of Dr. Blum's questionnaire, the Plaintiff also objects to the limited scope of its consideration. While Dr. Blum did opine that the Plaintiff can handle weight at the medium exertion level, Dr. Blum also limited the Plaintiff to sitting three hours total in a day (along with the option to change positions at will). That opinion statement is inconsistent with the ALJ's RFC assessment which finds the Plaintiff able to sit for seven hours total in a day, the Plaintiff points out. The discrepancy is material, the Plaintiff argues. When, at page 65 of the Administrative Record, the Plaintiff proposed a hypothetical to the VE based on a limitation to sitting no longer than three hours total in a workday, the VE answered that it would preclude his ability to

perform the three jobs identified. The ALJ explained that that limitation in conjunction with the limitation of standing and walking to three hours total in a workday does not add up to a full eight hour workday.

47. Next the Plaintiff argues that the ALJ incorrectly considered the work-related opinion statement that Dr. Billinghurst rendered on April 15, 2014 (found at pages 988—96 of the Administrative Record) regarding the Plaintiff's low back pain complaint. As the ALJ summarized it, Dr. Billinghurst opined that the Plaintiff is "capable of performing sedentary work with exertional and postural limitations". In other words Dr. Billinghurst saw less work ability than the ALJ. The ALJ gave his opinion statement "little weight" because it is inconsistent with the doctor's observation of "normal muscle size and tone with slightly reduced strength in his lower extremities". The Defendant argues that the ALJ thereby stated good cause for discounting the work opinion. This Court is unpersuaded. While Dr. Billinghurst did observe normal muscle size and tone, he also observed some (if minimal) loss of motor strength. He also observed decreased range of lumbar motion for which he diagnosed lumbago, and he took into consideration an MRI of the Plaintiff's lumbar spine, the one taken the day before on April 14, 2014, that showed two bulging lumbar discs.

48. The Defendant argues next that because Dr. Billinghurst is not a treating source, his work-related opinion statement is not entitled to great deference in the first place. It is true that Dr. Billinghurst examined the Plaintiff on a one-time basis for Worker's Compensation purposes and not as a treating source. However the ALJ did not state that as a reason to discount his opinion statement. Because this Court is remanding this case for other reasons, the ALJ can use the remand to re-consider Dr. Billinghurst's opinion statement, too.

49. For his third objection, the Plaintiff argues that the ALJ propounded an inaccurate hypothetical to the VE. This objection in effect re-states his objection to how the ALJ handled Dr. Blum's RFC opinion. If, as Dr. Blum opined, the Plaintiff can sit no longer than three hours total in a day, then the hypothetical that the ALJ proposed to the VE is incomplete because it lacked that particular limitation. This Court agrees with the Defendant that the remand renders this particular argument moot or at least premature. How the ALJ reconsiders Dr. Blum's opinion statement will affect the sufficiency of the hypothetical that the VE answered. If the remanded proceeding yields a more restrictive RFC assessment, then the ALJ will have to make a new vocational analysis.

50.   In addition to the above objections to the ALJ's Decision, the Plaintiff also raises an argument about the form of relief that this court should direct. That is, whether the ALJ's Decision should be vacated and remanded for re-consideration (as the Defendant seeks) or whether the ALJ's Decision should be reversed for the award of benefits without further consideration of the disability claim's merits (as the Plaintiff seeks).

51.   To resolve this dispute this Court begins with the controlling statute: 42 U.S.C. 405. Subsection (g) thereof gives this Court different kinds of remand relief. The one relevant to this case at this stage in the proceeding is sentence four of § 405(g). It gives the court the "power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Its plain language supports both sides' requested forms of relief.

52.   This Court turns next to Eleventh Circuit case law for guidance as to which one this Court should order here under the particular facts and circumstances of this case. The error subject of remand here in this case is the failure to state good cause to reject treating source opinion. Citing MacGregor v. Bowen, 786 F.2d 1050 (11th Cir. 1986), the Plaintiff asks this

Court to accept Dr. Blum's RFC questionnaire as true including
the limitation to sitting no longer than three hours total in a
workday. Because the VE testified that no work is available that
accommodates that limitation (in conjunction with time
limitations on standing and walking included in that particular
hypothetical), the Plaintiff argues that the evidence directs a
finding of disabled, with no need for further consideration.
However MacGregor does not automatically compel that result. As
it explains in Lawton v. Comm'r, 431 Fed.Appx. 830, 835 (11th
Cir. 2011), the Eleventh Circuit does not regard MacGregor's
holding---to the extent it instructs a court to accept a
treating source's opinion as true as a matter of law---as
binding precedent.

53. This Court does not go so far as to say Lawton wholly
forecloses such relief here. Lawton concerns the ALJ's failure
to address medical opinion evidence at all which is different
than the situation here where the ALJ did address the medical
opinion evidence but did so inadequately. See Cooper v. Astrue,
2009 WL 3242029, *13 (N.D.Fla. 2009) (making this same
distinction).

54. Consequently this Court considers the standard for
when a reviewing court may reverse a Decision for an award of
benefits. This Court finds that standard in the case of Davis v.

Shalala, 985 F.2d 528, 534 (11th Cir. 1993). A court may do so, Davis explains, "where the [ALJ] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." See also, Thomas v. Barnhart, 2004 WL 3366150 (11th Cir. 2004) and Jack v. Comm'r, 675 Fed.Appx. 887 (11th Cir. 2017). Applying the standard to this case, this Court cannot say that the cumulative effect of the evidence establishes disability without any doubt. This Court sees enough discrepancy in the medical opinion evidence generally and with Dr. Blum's opinion statement specifically to require the need for a fact-finder---the ALJ--- to weigh it out and to reconcile inconsistent evidence. The case of Stewart v. Comm'r, 2018 WL 3953994 (11th Cir. 2018) is on point with this case and supports this result.

55. That is not to say that the evidence necessarily contradicts a finding of disability or that the Plaintiff is not disabled. It is equally possible that after reconsideration the ALJ will make findings of fact that lead to a finding of disabled. The dispositive point is that Dr. Blum's RFC questionnaire does not by itself compel that conclusion with sufficient clarity to present one of those limited circumstances where the court, itself, can award benefits.

## CONCLUSION

56. This Court is sympathetic to the Plaintiff's situation. The Commissioner initially granted his disability application finding him capable of a reduced range of sedentary work. Upon reconsideration the Commissioner substantially increased his RFC assessment to one for medium exertion work. The Plaintiff objects to the Commissioner having a third consideration of his disability claim. The Plaintiff's attorney makes a well-reasoned argument for an alternative and more finite form of relief to correct the second ALJ's error. In the end analysis however this Court does not find the Social Security case law to support the relief of a reversal for an award of benefits. Instead this Court finds the controlling Social Security case law to support the Defendant's request for a remand for reconsideration. Upon remand the Commissioner shall reconsider the medical opinion statements of Dr. Blum and Dr. Billinghurst and do so in compliance with Stewart, supra. Depending on the outcome of that reconsideration, the Commissioner next shall re-assess the Plaintiff's RFC as appropriate. At the hearing the Defendant explained that for this kind of case the Commissioner may conduct a de novo review and update the record evidence. The Commissioner may follow its general procedure for conducting the reconsideration post-

remand. However this Court adds that the Commissioner should complete the reconsideration process and render the new Decision as expeditiously as practical. Under the circumstances fairness compels both thorough and accurate consideration as well as an expeditious Decision.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment (DE 27) is **GRANTED**. It is granted to the extent that the ALJ's Decision under review here is **REMANDED** back to the Commissioner for reconsideration pursuant to Sentence Four of 42 U.S.C. § 405(g). Reconsideration shall comply with the above instructions and to be completed as expeditiously as practical.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 22ⁿᵈ day of October, 2018.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE